```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                        :
UNITED STATES OF AMERICA                            24 Cr. 253 (NSR)
                                        :

   - v. -
                                        :

MICHAEL FITZGERALD SIMS.
                                        :

---------------------------------------X
```

<u>SENTENCING MEMORANDUM</u>

```
Dated:     White Plains, New York
           September 24, 2024

                                    Federal Defenders of New York
                                    Benjamin Gold
                                    Attorney for Mr. Sims
                                    81 Main Street
                                    White Plains, NY  10601
                                    (914) 458-8128


To:   Damian Williams
      United States Attorney
      Southern District of New York
      One St. Andrews's Place
      New York, New York
      Attn:  AUSA Margaret Vasu
```

**Federal Defenders**
OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, NY 10601
Tel: (914) 428-7124 Fax: (914) 948-5109

Tamara L. Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

September 24, 2024

The Honorable Kenneth M. Karas
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

      Re:    <u>**United States v. Michael Fitzgerald Sims**</u>
            **24-Cr-253 (NSR)**

Dear Honorable Karas:

      In 2023, Mr. Sims's life was spiraling out of control, largely because of his escalating drug use. His drug supplier had made him a deal: free drugs and housing if Mr. Sims helped the dealer sell drugs and assist in caring for the dealer's sick father. Mr. Sims, who used drugs every day, agreed. He sold drugs, and eventually he helped sell a firearm and ammunition, to confidential informants. While his conduct was unlawful, it is clearly related to his addiction. Moreover, Mr. Sims – a generous, loving man who has a documented history of helping those in need – is a victim himself. During his childhood, Mr. Sims had no father to provide support and guidance and his mother worked long hours, leaving Mr. Sims unsupervised for prolonged periods of time. While he was alone in his house, Mr. Sims was repeatedly sexually abused by an older family "friend" who took advantage of his vulnerable situation. The abuse took place over several years, and Mr. Sims was only able to escape it when, at the age of twelve, he began sneaking out of his home to avoid his abuser. Mr. Sims has never received adequate treatment for this trauma. Instead, he self-medicated with drugs and continued to be victimized: in 1986 he was shot multiple times and in 2023 he was stabbed by a relative of his drug supplier. Today, Mr. Sims understands that he needs treatment and support, both for his drug addiction and his traumatic past. Additionally, Mr. Sims is remorseful. Under these circumstances, and especially because Mr. Sims did not sell a large quantity of drugs, a sentence of a year and a day is more than sufficient.

<u>Mr. Sim's Chaotic and Unsupervised Childhood</u>

      Mr. Sims was born in 1967 in Valhalla, New York. PSR ¶ 83. He was raised by his mother, Doris Young, who initially supported the family through public assistance but then, when Mr. Sims was roughly seven, Ms. Young went back to school and became a nurse. As detailed by Sharon Sledge, Mr. Sims's oldest sister,

*United States v.* Michael Sims                                                                September 24, 2024
Sentencing Submission                                                                                      Page 2

"When we were born, we were a family on public assistance. Our mother took advantage of a Manpower Program that allowed her to go back to school to become a nurse in order to position herself to try and create a better life for us." Sharon Sledge Letter (Exhibit A).

      As a nurse, Ms. Young worked long hours. PSR ¶ 87. This enabled Ms. Young to move Mr. Sims and his five siblings from Mount Vernon to White Plains, where the family enjoyed an economically comfortable life. *Id.* But Ms. Young's work obligations meant that she could not be home to supervise Mr. Sims and his five siblings. *Id.* ¶ 87. Mr. Young, therefore, was supervised largely by his older siblings. *See* Sharon Sledge Letter (Exhibit A) ("Believe it or not, when I was seven years old, I used to babysit him while our mother went to work… [He] lack[ed] . .. adequate supervision"); Charlesina Young Letter ("The environment we grew up in wasn't easy, and though he did his best to navigate through those difficulties, drugs unfortunately became a destructive part of his life") (Exhibit B).

      A year or two after the family moved into their home in White Plains, the fifteen-year-old child of a family friend began to visit regularly. PSR ¶ 88. The teen spent a lot of time with Mr. Sims, who was eight years old at the time. *Id.* The teen often would sleep over, and he would sneak in to Mr. Sims's bedroom and sexually abuse young Mr. Sims. *Id.* The abuse, which Mr. Sims did not disclose to anyone until he was in his 50s, lasted until Mr. Sims was twelve and typically occurred while his mother was working the night shift. *Id.* As detailed by Mr. Sims's sister, "Michael was also the victim of sexual abuse by a close friend. This came to light about 10 years ago. I can't even begin to imagine the burden of carrying that deep, dark secret." Sharon Sledge Letter (Exhibit A). In order to avoid the abuse, Mr. Sims would spend time outside late at night, and he became friendly with some neighborhood drug dealers. PSR ¶ 88. This led to Mr. Sims using marijuana (beginning at 12) and cocaine (beginning at 13), which Mr. Sims was able to acquire by helping the drug dealers he had befriended on the street. *Id.* ¶ 89, 110-111.

      Mr. Sims attended school in the White Plains School District until he withdrew in 1986 during the 10th grade. *Id.* 116. Around this time, Mr. Sims began getting arrested. *Id.* ¶ 55, 116.

Mr. Sims as an Adult

      Mr. Sims has spent the majority of his adult life abusing drugs. *Id.* ¶ 110-115. He has six convictions for drug possession or sales, and his other convictions mostly relate to his drug addiction. *Id.* ¶ 57, 59, 62, 63, 71. For instance, during his most recent arrest in 2016 (when Mr. Sims was 49 and charged with robbery), Mr. Sims possessed crack-cocaine when he was arrested. *Id.* ¶ 70.

Despite his lifelong struggle with substance abuse, Mr. Sims has been able to maintain periods of sobriety. For instance, in 2017 he relocated to New Jersey, abstained from drug use, and found employment as a cleaner. *Id.* ¶ 94, 98, 119.

In his community, Mr. Sims is known as a man who is always willing to help those in need. Throughout his life he was close to his mother and, as she grew older, he would provide nearly daily support to her. *See* William Coleman Letter ("Mike was extremely close with our mom. He would visit her almost daily and assister her with her care"). As detailed by Sharon Sledge, "Some might view him as a bit of a 'mama's boy.' As the youngest son and baby in the family for many years, Michale doted on our mom. . . He would do anything he could to help out around the house, keep up the yard, cook meals, etc." Sharon Sledge Letter (Exhibit A). Michael Dryers, Mr. Sims's nephew, explains, "He has played an instrumental role in my upbringing, teaching me important values. . . When I faced personal challenges, he was always there . . . to help me overcome them." Michael Dryers Letter (Exhibit C). As detailed in the attached letters from Mr. Sims's family and friends, Mr. Sims is a generous man who is always willing to help those in need. For instance, when a family friend was diagnosed with Guillain-Barre syndrome, Mr. Sims "dropped everything and basically became one of his primary caregivers." Sharon Sledge Letter (Exhibit A). And when the boyfriend of Mr. Sims's mother developed Alzheimer's, Mr. Sims stepped up to help him. *Id.* (Exhibit A) ("During our stepfather's later years, he developed Alzheimer's disease. My mother needed help to care for him, and Michael no doubt out of his love for our mom, coupled with his inability to see someone in need and not help, stepped right up. He bathed and shaved Charles, things even his own biological son would not do"); William Coleman Letter (Exhibit D) ("Mike assisted his stepfather . . . despite them having a 'rocky' relationship").

In 2012 or 2013, Mr. Sims's younger sister, who herself was struggling with addiction and mental health issues, gave birth to a daughter, Lalayjah Pearson. *Id.* ¶ 90. Unable to care for Lalayjah, Mr. Sims's sister asked for help and Lalayjah was raised by Mr. Sims and his mother. *Id.* ¶ 90, 98. By all accounts, Mr. Sims was an amazing caregiver to Lalayjah. Mr. Sims's oldest sister explains, "he treated her like his daughter," "' Lala' was the daughter he never had. . . She was his little princess. . . Mike stepped up to assist them in caring for Lala and played a significant role in her life. He helped them to paint and set up a nursery for her. He bathed her. Dressed her, changed diapers, feed her, played with her, read to her and most importantly, loved her!" PSR ¶ 98, Sharon Sledge Letter (Exhibit A). *See also* Stephanie Dryers Letter (Exhibit E) ("His kindness, patience and unwavering dedication were evident as he helped me navigate through a challenging time of my life. He was a father figure to my daughter, Lalayjah, his niece. He watched over and made sure she was taken care of.").

*United States v.* Michael Sims                                          September 24, 2024
Sentencing Submission                                                               Page 4

      Tragically, Lalayjah died in 2015.  *See* Richard Liebson, *Police ID girl, 2, who died in White Plains house fire.* LOHUD, Nov. 14, 2015 (Exhibit F).  In a scene that will torture Mr. Sims for the rest of his life, on November 14, 2015, Mr. Sims left young Lalayjah in their familial home as he went to the store to purchase her a snack.  PSR ¶ 91.  Mr. Sims left Lalayjah with his mother and her boyfriend and he walked to the store.  *Id.*  When Mr. Sims got to the store, he received a number of frantic calls explaining that his home was on fire.  *Id.*  Mr. Sims rushed back and tried to enter the burning house to save his step-daughter, but he was physically restrained by the emergency responders.  *Id.*  Tragically, both Lalayjah and his mother's boyfriend died in the fire.  *Id.*

      Mr. Sims blame himself for Lalayjah's death.  His older sister explains, "Michael was never the same after that fire. . . he [had] promised to take [Lalayjah] outside to play. . . He told her he would do so as soon as he returned from the store.  She wanted to go with him but he told her to wait until he comes back and that he would bring her some Cheetos.  He left her in the room watching Pegga Pig, her favorite cartoon show.  When he returned to the house, he found it in flames.  He tried to go in to rescue her but firemen and the police held him back.  There is no doubt in my mind that he would have died trying to save her if [he] was able to enter that house!  He has been riddled with guilt ever since.  I can't tell you how much he lamented that he didn't take her to the store wit him.  He somewhat feels responsible for her death even though we know there was literally nothing he could do to save her or Charles."  Sharon Sledge Letter (Exhibit A).  *See also* Stephanie Dryers Letter (Exhibit E) ("My daughter passed away in an electrical fire.  Michael felt so much guilt, that he couldn't save her because he was out getting snacks for her.  He wishes he would've broken her with him.  Michael carried my daughter's coffin to her grave site, showing unconditional love for his niece whom he adored and loved very much, while mourning.").

      Mr. Sims, who had been able to control his substance abuse while caring for Lalayjah, had a mental breakdown following the horrible tragedy and was hospitalized at St. Vincent's and received treatment at NY Presbyterian.  *Id.* ¶ 92, 104-106.  Mr. Sims also began self-medicating with drugs.  *Id.* ¶ 93.  *See* Sharon Sledge Letter (Exhibit A) ("drugs was something he used to cope with this catastrophic life altering event").

The Offense

      By 2020, Mr. Sims was homeless and again was using drugs.  Mr. Sims's drug supplier offered to provide Mr. Sims housing and drugs if Mr. Sims moved into his home so that he could help take care of the dealer's sick father.  PSR ¶ 95.  Mr. Sims agreed.  So in 2021, Mr. Sims moved into the dealer's apartment and helped care for his supplier's father.  *Id.*  Eventually, Mr. Sims was performing hand-to-hands for the dealer.  *Id.*  Between May, 2023 and September, 2023, Mr. Sims made

seven sales to confidential informants. *Id.* ¶ 14-26. During one of these transactions, the confidential informant asked for a firearm. *Id.* ¶ 16. Mr. Sims, with the help of a co-defendant, eventually sold a firearm, and ammunition, to the confidential informant. *Id.* 22, 26.

During this same time period, Mr. Sims was using drugs and living at his dealers' home. On one particularly bad day, Mr. Sims was stabbed inside the apartment. The stabbing occurred on July 16, 2024 when a member of his dealer's family, who was high on PCP, stabbed Mr. Sims, which damaged Mr. Sims's lungs. *Id.* ¶ 100. Mr. Sims was hospitalized at Westchester Medical Center until July 21, 2023. The man who did the stabbing was arrested and incarcerated at Westchester County Jail. PSR ¶ 100.

Mr. Sims was arrested for his unlawful conduct on October 11, 2023. PSR P. 2. Unfortunately for Mr. Sims, when Mr. Sims was detained, he was sent to the same jail as his attacker and the two were eventually placed in the same unit. *Id.* ¶ 100. The man who had stabbed Mr. Sims threatened to hurt him, which forced Mr. Sims to protect himself by locking himself in his cell. *Id.* A month or two later Mr. Sims's attacker was finally transferred to another unit at the jail. *Id.* The man eventually pleaded guilty. *Id.*

Acceptance of Responsibility and Remorse

On April 25, 2024, Mr. Sims waived prosecution by information, and he pleaded guilty on that same day. PSR ¶ 1, 4.[1] During his allocution he admitted his conduct and apologized for his actions. Similarly, he told Probation that he had helped sell drugs and a gun and he explained, "Just because I was addicted to drugs does not make it right. I am sorry." *Id.* ¶ 32.

While incarcerated, Mr. Sims has had no disciplinary issues and he's worked as a porter. *Id.* ¶ 6. During this time period, Mr. Sims has expressed remorse to his family and friends. *See* Charlesina Young Letter (Exhibit B) ("he has expressed to me his determination to change and work toward becoming a better man"); Stephanie Dryers Letter (Exhibit E) ("Michael's arrest has made him more cautious of his actions and decisions, and aware of the consequences that come with breaking the law. His experience has led to a period of self-reflection, where he acknowledges his mistakes and feels genuine remorse for his actions.").

Incarceration has not been easy for Mr. Sims, who has many health problems and is in frequent pain relating to his stabbing and other past injuries. As detailed

---

[1] The PSR indicates that Mr. Sims pleaded guilty in front of the Honorable Robyn F. Tarnofsky. PSR ¶ 4. This is incorrect. Mr. Sims pleaded guilty in front of the Honorable Victoria Reznik. *See* ECF # 32, 34.

by Probation, while at the Westchester County Jail Mr. Sims has been treated for diabetes, high blood pressure, and for pain. PSR ¶ 103. But despite these difficulties, Mr. Sims has had the time to reflect on his behavior and to focus on improving himself. In his letter to Your Honor, Mr. Sims explains "My drug use has caused me to lose umpteenth years of my life. It's put a stain on me, my relationships, the system itself having to keep dealing with me. The countless people I've hurt in between. When you're involved in drugs, you're hurting yourself and others. You do the drugs because you're already in pain and then the drugs just cause more pain. I don't want to cause any pain to anyone else." Michael Sims Letter (Exhibit G).

Tragically, Mr. Sims's mother health took a turn for the worse after Mr. Sims was arrested. She was hospitalized in April, 2024 but she was expected to recover. Sharon Sledge Letter (Exhibit A). Then in June, she was moved to hospice care. Ms. Young died on July 7, 2024. Mr. Sims (via counsel) asked the Westchester County Jail to allow him an escorted hospital visit with his mother, a program the jail offers to inmates with family members who are dying. Unfortunately, the jail denied Mr. Sims's request, stating that county corrections officers can only provide supervised hospital visits to inmates who are in state custody. The United States Marshalls were next contacted, but they reported that the Marshalls no longer have the resources to provide emergency hospital visits. Mr. Sims then sought an emergency bail hearing where he sought temporary release to allow him a two-hour visit with his mother, *see* ECF # 37, but that application was denied.

Guidelines Objection

According to Probation, Mr. Sims's Guidelines are 37-46 months based on an offense level of 19 and a criminal history score of 4 (category III). PSR ¶ 53, 73-74, P. 29. The plea agreement calculated Mr. Sims's Guidelines differently. According to the plea agreement, Mr. Sims had only 2 criminal history points, which results in him being a category II offender with a Guidelines range of 30-37 months. The discrepancy relates to Mr. Sims's 2016 robbery conviction and whether Mr. Sims should be assessed 1, or 3, criminal history points for this offense. While Mr. Sims is not in a position to challenge Probation's determination that he served more than one-year and thirty days, we nonetheless object to the increased guidelines and ask the Court to consider the Guidelines outlined in Mr. Sims's plea agreement: 30-37 months. *See United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989) ("Since the Sentencing Commission has not yet fully considered plea bargaining as a factor in shaping the current guidelines. . . it is not startling that a district court presently may depart from a Guidelines sentence in order to give effect to a plea bargain if such a departure is warranted"); *United States v. Rodriguez*, 2024 WL 1478174 (Conn District Court, 2024) ("the Government is correct that this two-level

reduction was adopted through a *Fernandez* departure, to give effect to the plea agreement's Guidelines calculations.").

## The Most Appropriate Sentence: Twelve Months and a Day.

As Your Honor is well aware, in selecting a sentence this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id*. In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, **it must choose the lower sentence**. *See id*. at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence). In this case, Mr. Sims's conduct was unlawful. He knowingly sold small amounts of narcotics on multiple occasions and when asked to sell a gun, Mr. Sims helped orchestrate a gun sale to a confidential informant. But Mr. Sims was acting as a middleman: he was not the drug supplier or the gun supplier and instead was being used by dealers to perform hand to hands. Moreover, Mr. Sims's past is extremely sympathetic, he is remorseful, and his health is declining. Under these circumstances, Mr. Sims is worthy of a significant variance.

A. **The nature and circumstances of Mr. Sims's conduct do not necessitate a lengthy prison sentence.**

Mr. Sims did not get wealthy selling drugs. Nor did he attempt to get wealthy or intend to exploit the vulnerability of drug addicts. Instead, Mr. Sims was selling drugs, and then he helped sell a firearm and ammunition, to fuel his own addiction as part of a deal he had made with his own drug supplier. Some of the drugs Mr. Sims sold contained fentanyl, but Mr. Sims did not know this, and he was disturbed when he learned, through drug testing that occurred at the Westchester County Jail, that the drugs that he had been provided by his dealer contained fentanyl. PSR ¶ 113.

B. **Mr. Sim's history and characteristics, and his extreme remorse, justify leniency.**

Mr. Sims's life has not been easy. He was raised without a father by a young mother who struggled to meet the needs of Mr. Sims and his siblings. The family initially relied on the government for assistance, but then Mr. Sims's mother became a nurse which allowed her to provide material comforts to Mr. Sims and his

*United States v.* Michael Sims						September 24, 2024
Sentencing Submission								Page 8

siblings. But the financial security came at a cost. Ms. Young worked long hours, which meant that her children were usually unsupervised. As explained by Mr. Sims's older sister,

> When I was seven years old, I used to babysit him while our mother went to work. She was a single mom who had to work to provide for us, so I had to grow up pretty fast. As his 'second mom,' I watched him grow up. . . . We as kids/teenagers were somewhat taking care of ourselves. . . . The lack of adequate supervision during those formative years created a situation where Michael fell prey to getting involved with the wrong crowd. Sharon Sledge Letter (Exhibit A).

Unfortunately, the lack of adequate guidance did cause direct harm to Mr. Sims. He was sexually abused over the course of several years, usually when his mother was at work. Mr. Sims only escaped the abuse by sneaking outside of his home and hanging out on the street. PSR ¶ 88. Mr. Sims soon began using drugs, an addiction which has plagued him ever since.

Importantly, Mr. Sims – through both work history and extreme dedication to his family and friends – has demonstrated that, with assistance, he can maintain sobriety and live a law-abiding life. He helped raise his niece, who tragically died in 2015. *Id.* 91-92. And in 2017 he moved to New Jersey, lived with his sister, and found steady employment. *Id.* 94, 119.

Also significant, Mr. Sims has a huge heart. As detailed in the letters written by Mr. Sims's family and friends, Mr. Sims is selfless and always seeking to help others. His sister Sharon recalls how she had an accident and was disabled for six months. Sharon Sledge Letter (Exhibit A). During this time period, Mr. Sims stepped up and "checked [in] on me every day, cooking meals, cleaning, and even assisting me to the bathroom." *Id.* In the same fashion, Mr. Sims helped his sister Stephanie Dryers when she was the victim of domestic violence. Ms. Dryers explains, "I can remember a time when one of my boyfriends' beat me up and threw me out of a three story window. My brother, Michael came to my rescue. He was there for me every step of the way,. Providing not just physical assistance but emotional support as well." Stephanie Dryers letter (Exhibit E). Through the years Mr. Sims has shown similar support to his mother, his mother's boyfriend (who suffered from Alzheimer's), and a family friend who had had Guillian-Barre Syndrome. *Id.*

C. **The remaining sentencing factors justify leniency.**

Mr. Sims has been specifically deterred. At the time of his arrest, Mr. Sims

was an addict who was regularly using drugs which – unbeknownst to him – contained fentanyl.  Because of his arrest, he was immediately detained.  Mr. Sims's conduct was clearly linked to his substance abuse.  He has now been incarcerated for nearly a year and is no longer using drugs.  With continued treatment and support, Mr. Sims can maintain his sobriety and return to his family.  And through supervised release, Mr. Sims can be monitored, and the Court can be assured that he will not relapse.  Under these circumstances, additional incarceration is unnecessary.

Similarly, Mr. Sims's age suggests that he is not a significant risk to reoffend.  Mr. Sims is 56-years-old, which, statistically speaking, means that he less likely to reoffend than most offenders.

*Data from the Sentencing Commission*[2]



Regarding general deterrence, "social science conclusively finds that certainty matters more than severity."  Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021).[3]  "[T]he vast majority of people who are committing crime are not particularly forward-looking.  So adding five or ten years to an already long prison sentence simply doesn't have much of an effect on their behavior today." *Id.*  In a bulletin by the National Institute of Justice, the U.S. Department of Justice echoes, "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice,

---

[2] This screenshot is from a United States Sentencing Commission Report titled *Report at a Glance: Recidivism and Federal Sentencing Policy*.  A copy of this report is attached as Exhibit H.

[3] Available at https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/?sh=5d6e77837bd4 (last accessed on September 23, 2024).

*United States v.* Michael Sims                                                September 24, 2024
Sentencing Submission                                                                     Page 10

Five Things About Deterrence 1, National Institute of Justice (May 2016).[4] "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id.*

      Additionally, a short custodial sentence followed by court-mandated treatment and probation supervision would comport with 18 USC § 3553(a)(2)(D), which "requires the district court to consider the need for future medical or correctional treatment in devising a sentence". *United States v. Williams*, 65 F.3d 301, 307 (2d Cir., 1995). Here, Mr. Sims has never properly dealt with traumatic loss of Lalayjah, and the guilt associated with the horrific fire that killed her. Similarly, Mr. Sims has never received treatment for the prolonged sexual abuse that he experienced as a child. Additionally, Mr. Sims has significant health issues, including chronic pain, diabetes and high blood pressure. Under these circumstances, prolonged incarceration would be especially cruel to Mr. Sims, who is currently incarcerated at MDC. A lengthy prison term, therefore, would only delay Mr. Sims's recovery recovery and would – in an unreasonably and cruel manner – unnecessarily prolong Mr. Sims's extreme, trauma related struggles that are actively causing him distress and pain *today*.

      Finally, a sentence of time-served would not create a sentencing disparity. The co-defendant in his case, who admittedly was not involved in drug sales but who was responsible for the sale of the revolver, was sentenced to one-year and one-day of incarceration. PSR ¶ 7. Mr. Sims's drug sales were serious, but they were only a handful of sales and did not involve significant quantity of drugs. Mr. Sims, therefore, should not receive a sentence that is greater than his co-defendant.

## CONCLUSION

      There is nothing to be gained by a draconian sentence in this case, especially in light of Mr. Sims's remorse and his sympathetic past.

      Thank you for your consideration.

                                                                 Sincerely,

                                                                 //s

                                                                Benjamin Gold
                                                                Assistant Federal Defender

cc:     AUSA Margaret Vasu

---

[4] Available at https://www.ojp.gov/pdffiles1/nij/247350.pdf (last accessed on September 23, 2024).